786 P.2d 983

**ST. JOSEPH'S HOSPITAL AND MEDICAL CENTER, an Arizona corporation, Plaintiff–Appellant,**

v.

**MARICOPA COUNTY, a body politic, Defendant–Appellee.**

No. 1 CA–CIV 88–047.

Court of Appeals of Arizona, Division 1, Department D.

Sept. 7, 1989.

Review Denied Feb. 26, 1990.

Gammage & Burnham by Richard B. Burnham, Curtis Ullman and Tracey L. Fletcher, Phoenix, for plaintiff-appellant.

Richard E. Romley, Maricopa County Atty. by Gordon J. Goodnow, Jr., Deputy County Atty., Phoenix, for defendant-appellee.

## OPINION

SHELLEY, Judge.

This case deals with the statute that defines indigency for purposes of public health assistance. We hold that the statute must be construed to render a patient ineligible for public assistance if his spouse owns separate property that exceeds the maximum set by the statute. We also hold that the statute, so construed, does not offend due process and does not work an unconstitutional taking of property.

## BACKGROUND

Donald Neu was admitted as an emergency patient to St. Joseph's Hospital and Medical Center in April of 1985, and he remained hospitalized there for almost two months, incurring charges of over $50,000, of which he paid only a small part. St. Joseph's sought reimbursement of most of the balance due from Maricopa County, and the county refused to pay, claiming that Neu was not eligible for assistance.

For the purposes of this appeal, eligibility for county health care is determined under the version of A.R.S. § 11–297(B)(2) that was in effect in 1985. An indigent was then defined as a resident of the county whose income does not exceed a specific level, and

> [d]oes not have resources of all persons in the household, including but not limited to equity in a house or car, with a net worth in excess of thirty thousand dollars, with no more than five thousand dollars cash or other liquid assets.

A.R.S. § 11–297(B)(2) (1985 Ariz.Sess.Laws ch. 316, § 5).[1]

Donald Neu's assets at the time of his hospitalization totaled substantially less than $30,000. His wife owned, as her sole and separate property, the home in which they lived, a part interest in a shopping center, and some automobiles. Because the value of Mrs. Neu's separate property exceeded the statutory maximum, Maricopa County determined that Donald Neu was not "indigent" and was therefore not eligible for county health services. Maricopa County denied St. Joseph's claim for reim-

---

1. A.R.S. § 11–297(B)(2) has been subsequently amended, increasing the limitation on resources from $30,000 to $50,000. 1986 Ariz.Sess.Laws ch. 380, § 2. The statute was again amended to add:

> For an individual applicant who is married, any separate property of the applicant's

spouse that does not exceed seventy-five thousand dollars shall not be included in determining the net worth of resources of the applicant. 1988 Ariz.Sess.Laws ch. 3, § 1. All textual references to A.R.S. § 11–297(B)(2) are to the 1985 version, unless otherwise noted.

bursement of Donald Neu's hospitalization charges.

St. Joseph's sued the county on its claim, and the trial court, agreeing with the county's position, granted summary judgment in its favor.

On appeal, we consider the following questions:

A. Statutory Interpretation: Whether the separate property of a spouse can be considered in determining an individual's indigency pursuant to A.R.S. § 11–297(B)(2);

B. Due Process: Whether A.R.S. § 11–297(B)(2) is arbitrary and denies Donald Neu and St. Joseph's due process;

C. Unconstitutional Taking: Whether Maricopa County's failure to reimburse St. Joseph's for emergency services is an unconstitutional taking of private property without just compensation; and

D. Restitution: Whether St. Joseph's is entitled to recover from Maricopa County for services rendered under a theory of restitution.

We decide each of these issues in favor of Maricopa County.

## THE SEPARATE PROPERTY OF A SPOUSE MAY BE CONSIDERED IN DETERMINING INDIGENCY

The parties agree that the medical expenses of a spouse are not collectable out of the separate property of the other spouse. Donald Neu's medical expenses were payable only out of the community income and assets and Donald's separate property. For the purpose of this opinion, we accept that as the law.[2]

To be eligible for county health care benefits, a person must have income below a specified level and may not have "resources of all persons in the household" in excess of $30,000 with not more than $5,000 in cash or other liquid assets. A.R.S. § 11–297(B)(2). According to St. Joseph's, Arizona community property principles and public policy require that the phrase "resources of all persons in the household" in § 11–297(B)(2) be construed to include only assets actually available to the patient or his creditors. So construed, the statute would require the county to reimburse the hospital for Neu's care.

■ Eligibility statutes, the hospital argues, must be liberally construed with the dual purposes of delivering health care to those who cannot afford it and protecting a private hospital's right to receive reimbursement from the county. It cites a number of Arizona decisions for this premise. Although we acknowledge the underlying principle, none of the cases cited offer specific guidance in determining whether "resources of the household" must be construed to exclude a spouse's separate property when the plain language of A.R.S. § 11–297(B)(2) states otherwise.

■ St. Joseph's also cites cases from other jurisdictions for the proposition that welfare statutes or regulations cannot preempt community property principles. *See Harper v. New Mexico Dept. of Human Services*, 95 N.M. 471, 623 P.2d 985 (1980); *Duran v. New Mexico Dept. of Human Services*, 95 N.M. 196, 619 P.2d 1240 (App.1980); *see also Purser v. Rahm*, 104 Wash.2d 159, 702 P.2d 1196 (1985), *cert. dismissed*, 478 U.S. 1029, 107 S.Ct. 8, 92 L.Ed.2d 763 (1986), all holding that the uniform federal regulation, which was meant to apply to all states (both community and non-community property), had to be interpreted in the context of local law. These decisions shed little light on how the specific problem before us is to be resolved. In this case, the same legislature which has codified our community property law enacted A.R.S. § 11–297.

St. Joseph's also cites *Herrera v. Health & Social Services*, 92 N.M. 331, 587 P.2d 1342 (App.1978), which held that the word "income," as used in New Mexico's eligibility statute, had to be interpreted in light of

---

**2.** We note that in California, a spouse's separate property may be reached to satisfy debts incurred for the other spouse's "necessaries of life." Cal.Civ.Code 5120.140(a)(1) (West Supp. 1989); *In re Higgason's Marriage*, 110 Cal.Rptr. 897, 10 Cal.3d 476, 516 P.2d 289 (1973). There is no comparable civil statute in Arizona.

that state's community property law. The upshot was that since half the patient's income belonged to his wife under community property principles, he was under the maximum limit to qualify for public assistance. The problem is that in the context of the New Mexico statute, "income" was a more ambiguous term than the phrase, "resources of all persons in the household," with which we deal here.

In our opinion, this phrase, "resources of all persons in the household," unmistakably indicates an intent to include a spouse's separate property. No limitation of the type of resources—separate or community—is expressed in the statute. To construe it otherwise would require reading into the statute something that the legislature did not put there. This, we ought not do. *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133, 407 P.2d 91, 93 (1965).

As noted in footnote 1 to this opinion, the legislature has recently amended the relevant statute to exempt the first $75,000 of the spouse's separate assets from the indigency calculation. From this action, we can infer that the legislature was aware of the county's policy to include all separate property in the calculation. The amendment does not reveal whether the county's policy comported with the legislature's intent under the old statute. The amendment is either a liberalization of the qualification guidelines, or a restriction of it, depending on one's viewpoint. In either case, the legislation now clearly requires that a spouse's separate property—albeit only that which exceeds $75,000—be included in the indigency calculation. The legislature was obviously aware of community property principles when it first enacted § 11–297(B)(2). If it intended community property principles to temper the eligibility calculation, it could have expressly done so, as evidenced by the recent amendment.

## THE STATUTE DOES NOT OFFEND DUE PROCESS

We turn to St. Joseph's argument that the statute, as we construe it, is arbitrary, capricious, and violative of the due process clauses of the state and federal constitutions.

Economic regulations need only be rationally related to a legitimate state interest. *Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981). *See also* Comment, *Economic Substantive Due Process in Arizona: A Survey*, 20 Ariz.St.L.J. 327 (1988). St. Joseph's acknowledges this well-settled principle but claims that the inclusion of a spouse's separate propety in the indigency calculation is irrational. We disagree.

As St. Joseph's acknowledges, the legislature may and must draw financial eligibility lines somewhere. Under current eligibility criteria, a married couple can earn no more than $3,333 per year to qualify as indigent. This line is necessarily arbitrary, and, we realize, not realistically calculated to provide adequate health care for any but the poorest of the poor. Those who make more than $3,333 per year and cannot afford medical care are simply on their own, except in one respect—if they present themselves at a hospital for *emergency* treatment, they cannot be turned away. *See Thompson v. Sun City Comm. Hosp.*, 141 Ariz. 597, 602, 688 P.2d 605, 610 (1984).

As we have already observed, St. Joseph's acknowledges that the legislature must "draw the line somewhere." St. Joseph's admits that the county is not required to reimburse the hospital for those emergency patients who do not qualify under the basic indigency guidelines. However, it challenges a detail in the legislature's drawing of the line when it contends that the legislature so unreasonably narrows its prospects of reimbursement as to violate due process when the legislature includes within the calculation of household assets available to the patient the separate property of the patient's spouse.

We cannot agree that including a spouse's separate property as a legislative exercise in line-drawing lacks sufficient rationality to satisfy the requirements of due process. St. Joseph's argues that the inclusion of separate property creates an irrebuttable and irrational presumption that an

indigent whose household assets exceed the limit can afford health care. In some cases, spouses will no doubt decline to pay. It is not, however, irrational that the legislature expect that those possessing sufficient separate assets will voluntarily pay for a spouse's necessary medical care. The system St. Joseph's proposes—that separate assets be excluded—would create a disincentive for those with adequate assets to provide for the health needs of an indigent spouse. This, apparently, is not the policy the legislature has chosen to adopt.

We turn to St. Joseph's next argument, that the system effects an unconstitutional taking of its property without just compensation.

## THE STATUTE IS NOT AN UNCONSTITUTIONAL TAKING OF THE HOSPITAL'S PROPERTY

■ St. Joseph's asserts that if a patient's indigency is determined by including the separate property of his spouse, which cannot be reached by a private hospital for the payment of hospital bills, the statute violates the "taking" clauses of the state and federal constitutions. It posits that the private property taken was the use of its services, facilities, and supplies, because, in Arizona, hospitals must provide emergency treatment regardless of the person's ability to pay. *Thompson*, 141 Ariz. at 602, 688 P.2d at 610. We disagree.

In reality, St. Joseph's claim is that the *indigency calculation*, together with the requirement that the hospital *must treat* all emergency patients, constitutes a taking. The logical extension of this argument, as the county points out, is that any time the hospital is unable to collect on its emergency bill, the county (or state) must pay. St. Joseph's cites a mischievous footnote in *St. Joseph's Hospital v. Maricopa County*, 130 Ariz. 239, 635 P.2d 527 (App. 1981). That footnote referred to the suggestion made by a Massachusetts court in an earlier case, that if a hospital were requested to accept indigents and the public authorities refused to pay, such *might* constitute a taking. The suggestion was mere dicta.

Traditional eminent domain cases shed some light on the question. The typical eminent domain case involves the taking or regulation of real property which diminishes or destroys the value of that property to the owner and provides a direct benefit to the state. This case is atypical because the benefit—emergency health care—inures to the patient directly. The only fiscal benefit the state enjoys is that it does not have to pay for the patient's care, unless the patient qualifies as indigent. There is some authority for the proposition that the government must pay for an unconstitutional taking of property, even if it is another who derives the benefit. *See Ivey v. United States*, 88 F.Supp. 6, 8 (E.D.Tenn. 1950). In any event, the eminent domain analysis provided in property-use-regulation cases will be our guide.

As we stated in *Corrigan v. City of Scottsdale*, 149 Ariz. 553, 720 P.2d 528 (App.1985) *aff'd in relevant part*, 149 Ariz. 538, 720 P.2d 513 (1986):

> There are no set formulas for determining at which point a regulation effects a taking of property.... Rather a two step process is required. First, we must determine *whether a legitimate state interest is substantially advanced* by the ordinance at issue.... Second, we focus on *whether the ordinance denies the owner the economically viable use of the land* .... Ultimately the issue is whether the public at large, rather than a few landowners should bear the burden of an exercise of police power.

*Id.* 149 Ariz. at 560, 720 P.2d at 535 (citations omitted) (emphasis added). *See also Ranch 57 v. City of Yuma*, 152 Ariz. 218, 225–26, 731 P.2d 113, 120–21 (App.1986).

### 1. Legitimate State Interest.

In this case, we deal with the operation of two regulations that purportedly effect a taking. The first is a regulation developed by case law—that hospitals are required to accept emergency patients without regard to their ability to pay. We think it is beyond discussion that this requirement advances a legitimate state in-

terest. As our supreme court stated in *Thompson:*

> 'If a person, seriously hurt, applies for ... aid at an emergency ward ... a refusal might well result in worsening the condition of the injured person, because of the time lost in a useless attempt to obtain medical aid.'

141 Ariz. at 602 n. 3, 688 P.2d at 610 n. 3 (citations omitted).

The state's interest in the indigency calculation also is legitimate. As discussed earlier in this opinion, the legislature must "draw lines" in order to allocate scarce resources. Including separate property in a household's resources for indigency purposes encourages family members to use their private resources to pay for medical care rather than allowing that burden to fall on public coffers. Therefore, we answer the first question posed in *Corrigan* affirmatively and turn to the second prong.

### 2. Denial of Economic Use.

Obviously, these regulations are not tantamount to a complete condemnation of the hospital. The questions for the court then is whether the regulation is so severe as to deny the owner a reasonable economic use of the property and whether, in justice and fairness, the burden should fall on the hospital or on the public as a whole. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978); *Ranch 57*, 152 Ariz. at 226–27, 731 P.2d at 121–22.

The *Penn Central* Court, noting that this determination is essentially an ad hoc factual inquiry, identified several significant factors. The first factor mentioned in *Penn Central* is the economic impact of the regulation on the plaintiff, particularly the extent that the regulation has interfered with the plaintiff's "investment-backed expectations." *Id.* 438 U.S. at 123–24, 98 S.Ct. at 2659. We have absolutely nothing in the record to indicate the extent to which these regulations have effected St. Joseph's profitability. We know that St. Joseph's is unable to collect on the Neu account, totaling $50,006.45. We do not know what percentage of that figure is

expected profit, nor do we know the impact these regulations have had on the hospital's *overall* profitability. Presumably, these "bad debts" are absorbed by the hospital as a cost of doing business and are ultimately passed on to the consumer. St. Joseph's has not provided us with adequate information upon which we could determine that it has suffered economic hardship tantamount to an unconstitutional taking.

### 3. Governmental Action.

Another factor mentioned in *Penn Central* is the "character of the governmental action." The Court explained:

> A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (citation omitted). Here, the regulations fall far short of that which is traditionally considered an unconstitutional taking. The state has not "invaded" the hospital but has simply required hospitals, as a condition of doing business in Arizona, to accept emergency patients without regard to their ability to pay. The state or county will reimburse the hospital for the care extended to qualified indigents. For all patients who do not qualify as indigent, the hospital must look to the patient for reimbursement.

The regulation mandating emergency care benefits the common good (not only the poor or uninsured) because no one can be denied emergency care for failing to provide proof of insurance or credit worthiness. The aspect of the regulation that denies families county-funded health care if one spouse possesses assets in excess of the statutory limit also benefits the common good, because it encourages families to pay for services rendered for family members rather than allowing that burden to fall on state coffers.

Having reviewed the relevant factors, we cannot find that, in the case of Donald Neu, this regulatory scheme amounts to an un-

constitutional taking of the hospital's property.

## RESTITUTION

As a final issue for appeal, St. Joseph's contends it should be able to collect from the county on a theory of restitution. Appellant cites to sections 114 and 115 of the *Restatement of Restitution* in support of its theory. The fatal flaw in appellant's argument is that for the county to be liable for Donald Neu's emergency care under a restitution theory, it must have had a duty to provide that care. St. Joseph's claims that the county's duty arises from A.R.S. § 11–291, which requires the county to provide medical care to indigents. As we have determined earlier in this opinion, the county had no duty to provide care for Donald Neu, because he did not qualify as an indigent. Because the county had no duty, it is also not liable in restitution.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed.

KLEINSCHMIDT, P.J., and FIDEL, J., concur.